Joseph D. DiMASE et al.

v.

FLEET NATIONAL BANK et al.

No. 97–67–Appeal.

Supreme Court of Rhode Island.

Jan. 22, 1999.

John D. Deacon, Providence, for plaintiffs.

Robert D. Wieck, Richard L. Gemma, Providence, for defendants.

Present LEDERBERG, BOURCIER, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

This case is before us on the defendant Fleet National Bank's appeal from a Superior Court final judgment, following a jury's verdict, which awarded the plaintiffs $197,000 in damages. The plaintiffs cross-appeal on the issue of when pre-judgment interest should have commenced.

### I

### Facts and Travel

On November 17, 1977, Joseph J. Mollicone, Jr. (Mollicone), Joseph D. DiMase, M.D., and Edward A. Iannuccilli, M.D. formed a limited partnership named Southside Medical Center Company (Southside). All three were general partners. On May 5, 1981, Francis A. Connor, M.D., John P. DaSilva, M.D., Richard R. Geisler, M.D., John C. Simkevich, M.D., and Clark A. Sammartino, M.D. formed a general partnership named 120 Dudley Street Associates (Dud-

ley). On January 3, 1983, Southside transferred to Dudley an undivided one-half interest in property that Southside owned in Providence. That property was divided into condominium units.[1]

On February 4, 1986, the doctor-partners of Southside and Dudley refinanced the recently acquired Providence condominium property and obtained a $950,000 loan through the now defunct Marquette Credit Union (Marquette). One month later, on March 6, 1986, the doctor-partners of Southside and Dudley each signed a promissory note for $200,000 from Southside and Dudley to Atrium Financial Services Corporation (Atrium). At that time, the doctor-partners also executed a mortgage deed in favor of Atrium, a security agreement and assignment of leases to secure the note, and a personal guaranty obligating all of the doctor-partners of Southside and Dudley as well as Mollicone. In addition to being one of the partners of Southside, Mollicone was also an officer of Atrium, the holder of the note. The doctor-partners allege that they signed the various loan-mortgage documents "in blank" without reading them. Therefore, they claim that they were not aware of the actual contents of the various documents and that they were unaware that they were granting a mortgage on the partnerships' property. They never disputed, however, that their signatures on the various loan-mortgage documents were genuine.

On the same day that the promissory note for the loan was signed, a male courier came to Atrium's office and delivered the promissory note, which had been signed by the doctor-partners of both Southside and Dudley, to Eileen Magnani (Magnani), the office manager at Atrium. The courier then requested Atrium's check for the disbursement of the loan funds. After obtaining Mollicone's approval, Magnani then gave the courier Atrium's check for $197,000, representing the net loan proceeds. The check was made payable to Southside and Dudley.

The loan check, after being restrictively indorsed "for deposit only," was later depos-

1. All the partners, other than Mollicone, involved in the Southside–Dudley condominium project will throughout this opinion be referred to collectively as the doctor-partners.

ited at Heritage Savings and Investment Bank (Heritage) on March 6, where the majority of the loan proceeds—$111,174—was then credited to "Joe's number," an internal Heritage account used by Mollicone to withdraw funds from Heritage without bank regulators' knowledge. The remainder—$85,826—went into an internal cash account at Heritage. At the end of the business day on March 6, the check then was deposited in Heritage's general account at Fleet National Bank (Fleet).

From April 1986 through 1989, twenty-six payments were made on the Atrium loan from a Southside and Dudley checking account that was used to pay the operating expenses of Southside and Dudley. At the end of each year, Dudley's accountant met with Southside's accountant to review the partnerships' books and records. The payments that had been made on the loan were carried in the partnership records as "Atrium pass-through" on the accountants' worksheets. That designation, it was claimed, was used to denote that the loan was actually a receivable due from Mollicone and was not an obligation of Southside and Dudley. Because the loan was not considered an obligation of Southside and Dudley, the interest that was paid on the "Atrium pass-through" was never claimed or accounted for on the respective federal or state tax returns of Southside and Dudley. In June 1989, when the Southside and Dudley partners were considering the termination of their business relationship in the condominium property, Mollicone informed the partners that the Atrium mortgage was his personal obligation and that he would take care of it. He never did.

The Atrium loan in March, 1986 was assigned from Atrium to the Providence Teachers Credit Union. However, no attempt by the credit union was made to collect the loan until the Rhode Island Depositors Economic Protection Corporation (DEPCO) became responsible for collecting the obligations of the Providence Teachers Credit Union after Mollicone's suspect banking practices caused that credit union, as well as Heritage and other banking institutions, to close per the Governor's orders.

In response to DEPCO's attempt to collect on the loan, the partners of Southside and Dudley commenced a civil action in the Superior Court against DEPCO, alleging that the promissory note was unenforceable for failure of consideration. In that action, they denied liability under the promissory note and sought injunctive relief against DEPCO from foreclosing on the mortgage.

In May 1993, while their action was pending in the Superior Court, Southside and Dudley were able through discovery procedures to gain actual possession of the Atrium loan check that had been deposited in Fleet. It was then that they first noticed that the indorsement signature on the Atrium loan check was not that of any authorized partner. They promptly filed an amended complaint adding Fleet as a defendant. In the amended complaint, they alleged that Fleet had deposited the check in violation of the payee's restrictive indorsement. That count was later voluntarily dismissed by the plaintiff partners.[2] They then reached settlement with DEPCO on DEPCO's claim on the note.

On October 5, 1995, after the plaintiffs had settled with DEPCO, the plaintiffs then, for the first time, formally demanded that Fleet return the Atrium check to them because Fleet had honored the check over an alleged forged indorsement. Having then met the demand requirement for a conversion action, the civil action complaint was once again amended, this time adding two counts alleging conversion by Fleet of the Atrium check funds. The first conversion count alleged an unauthorized indorsement and the second alleged an incomplete, improper or defective indorsement based on the fact that the indorsement allegedly read "Southside Medical Center Company at 120 Dudley Street, Associates," using the word "at" instead of the conjunctive "and," and did not contain the signature of both Southside *and* Dudley as required by the face of the check.

In response to the second amended complaint, Fleet filed its counterclaim against the

---

2. The count was dismissed because Heritage, being the bank at which the check was deposited, was the one obligated to comply with the restrictive indorsement, not Fleet.

plaintiff-doctors for equitable indemnification based upon an alleged breach of the fiduciary duty owed by the doctor-partners to the Southside and Dudley partnership project. On April 12, 1996, several months prior to trial, the trial justice granted the plaintiffs' motion to dismiss Fleet's counterclaim.

At the close of trial on the doctor-partners' civil action in September 1996, the trial justice submitted jury verdict interrogatories to the jury. The jury, after finding in favor of the plaintiffs, returned verdicts for the doctor-partners on both the unauthorized indorsement count as well as the incomplete indorsement count, but awarded damages according to the jury verdict interrogatories in the amount of $197,000 on only the first count. Pre-judgment interest then was calculated from July 1993, the date of the first amended complaint in which a claim for violation of a restrictive indorsement had been asserted against Fleet. Fleet appealed from the judgment entered on the jury's verdict and the plaintiffs cross-appealed, contending that pre-judgment interest should have been calculated from the time of the plaintiffs' demand for the Atrium check from Fleet.

In its appeal, Fleet raises many claims of error alleged to have occurred during trial on the part of the trial justice. Of those claimed errors, two, we conclude, are dispositive of this appeal. Fleet asserts in the first of those dispositive claimed errors that the trial justice erred in dismissing its counterclaim for equitable indemnification from the doctor-partners of Southside and Dudley and, in the second claimed error dispositive of this appeal, Fleet posits that the trial justice erred in granting the plaintiffs' motion for judgment as a matter of law with respect to Fleet's affirmative defense which alleged that the plaintiffs' negligence had substantially contributed to the unauthorized indorsement on the Atrium check. We agree and conclude that the trial justice erred in making those two rulings. Accordingly, a new trial on the merits is warranted. Because we are ordering a new trial, we deem unnecessary our consideration of the other alleged trial errors raised by Fleet or by the plaintiffs in their cross-appeal.

II

The Counterclaim

Fleet's counterclaim for equitable indemnification was based on the alleged and negligent wrongful conduct of the doctor-partners of Southside and Dudley. Fleet claimed that according to equitable principles, the partners of Southside and Dudley should be held responsible for the unauthorized indorsement because they, Fleet alleged, had breached the fiduciary duty they as partners owed to Southside and Dudley.

■■■ To be entitled to equitable indemnification, Fleet would have been required at trial to prove that (i) the party seeking indemnity (Fleet) is liable to a third party (Southside and Dudley); (ii) the prospective indemnitors (doctor-partners) are liable to the third party (Southside and Dudley); and (iii) the obligation ought to be discharged by the indemnitors (doctor-partners). *See Muldowney v. Weatherking Products, Inc.,* 509 A.2d 441, 443 (R.I.1986). The theory underlying the concept of equitable indemnity is that "one who has been exposed to liability solely as the result of a wrongful act of another should be able to recover from that party. *** If another person has been compelled to pay damages that should have been paid by the wrongdoer, the latter becomes liable to the former." *Id.*

■ In order for the plaintiffs to have been successful on their motion in this case to dismiss Fleet's counterclaim, plaintiffs were required to show that Fleet would not be entitled to relief under any set of its alleged facts, and the trial justice, in ruling on the plaintiffs' motion to dismiss Fleet's counterclaim, was required to view Fleet's allegations in the light most favorable to Fleet. *Builders Specialty Co. v. Goulet,* 639 A.2d 59 (R.I.1994).

■ The trial justice, in her decision, never once concluded that Fleet would not be able to prevail on the facts presented in Fleet's counterclaim. She was required to do so under the standard applicable when ruling upon a motion to dismiss. In fact, the trial justice envisioned when passing upon the plaintiffs' motion to dismiss, the probabil-

ity that Fleet might prevail because she said that "[i]f these plaintiffs behaved in any manner that was inappropriate, not credible, any other term of art you want to use. The jury is going to weigh that. They're going to consider that. If they find that, they're not going to prevail." Thus, the reasonable inference to be drawn from the trial justice's comments is that Fleet could have probably proven facts in support of its contentions, even though she erroneously assumed that Fleet's counterclaim was not warranted. The trial justice appears to have reasoned that because the jury would be considering the plaintiffs' behavior in the case in chief, Fleet's counterclaim which involved some of the same considerations would only "muddy the waters." However, the fact that some of the same evidence could be considered by the jury when passing on both the plaintiffs' case in chief as well as on Fleet's counterclaim is not a proper basis upon which a trial justice should dismiss a counterclaim.

The above rings especially true in the situation presented here where, although there might be some overlapping evidence carrying over into the counterclaim, Fleet's counterclaim asserted different allegations than those involved in the plaintiffs' case in chief. The counterclaim for equitable indemnification alleged, for example, that the doctor-partners had breached their fiduciary duties to the partnership and that as a consequence thereof, equity demands that the doctor-partners, and not Fleet, should be held responsible for the damages caused by the unauthorized Atrium check indorsement. The plaintiffs' case in chief did not involve any consideration of whether there was a breach on the part of the plaintiff-doctors of their fiduciary duties owed to the partnerships, or whether it would be more equitable for the plaintiff-doctors to bear the responsibility for the unauthorized indorsement, rather than Fleet. Accordingly, because the trial justice failed to find that Fleet would not be able to prevail on any set of facts alleged by Fleet in its counterclaim and because the facts as alleged by Fleet, if proven, could result in a verdict for Fleet on its counterclaim, the trial justice erred in dismissing the counterclaim.

## III

### The Affirmative Defense

Additionally, we note, Fleet's affirmative defense, which had alleged that the plaintiffs' negligence substantially contributed to the unauthorized signature, should have been submitted to the jury. That affirmative defense is permitted pursuant to G.L.1956 § 6A-3-406, which reads:

"Any person who by his or her negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

Thus, if Fleet had been permitted to prove that the doctor-partners of Southside and Dudley had acted negligently in the manner in which they had executed the Atrium loan documents and had permitted Atrium and Mollicone to function through their partnership and its records, and that such negligence substantially contributed to the making of the unauthorized signature on the Atrium loan check, then Fleet could not have been held liable for conversion if it had paid the Atrium check in good faith and in accordance with reasonable commercial standards. Certainly there was enough evidence in the record to warrant the submission of that affirmative defense to the jury. The doctor-partners had admitted to signing the loan documents without first reading them and without having knowledge of what was contained in the loan papers. One of the doctor-partners of Southside had testified at trial that although Mollicone was the managing partner of Southside, Mollicone's responsibilities and the extent of Mollicone's authority was unknown by that doctor-partner. That same doctor-partner also believed that Diana Dumin, who managed the Southside–Dudley partnership property for Mollicone, had the authority to sign checks, on behalf of the partnership, but there was no partnership paperwork indicating that she had any such

authority. Strangely enough, it appears that none of the doctor-partners of Dudley actually knew who, under Mollicone's direction, was authorized to sign checks on Dudley's behalf.

The doctor-partners of Southside and Dudley also admitted during trial that Mollicone's office handled all the financial aspects of the Providence property project. The doctor-partners testified that they never reviewed any project account statements and never reviewed the checks written on the account maintained specifically for the operating expenses of the Providence property. Further, funds for projects *not* involving the Providence property were deposited in the Providence property account.

There appears in the trial record what seems to be reasonable evidence that Fleet had acted in good faith and in a commercially reasonable manner when it deposited the Atrium loan check in Heritage's account. Fleet's only obligation then as the drawee bank was to honor the indorsement of its immediate transferor, in this case Heritage. Fleet did just that when it deposited the check into Heritage's account at Fleet. That trial evidence was certainly sufficient to permit reasonable minds to differ as to whether the actions of the doctor-partners of Southside and Dudley substantially contributed to the unauthorized signature. Furthermore, because the trial justice failed to elaborate in any manner as to why she refused to submit Fleet's good faith in accordance with reasonable commercial standards affirmative defense to the jury, we are unable to conclude from the record for what reason she kept Fleet's affirmative defense from the jury. We are satisfied that Fleet's affirmative defense should have been submitted to the jury.

Because the affirmative defense permitted by § 6A–3–406 should have been submitted to the jury, and because the other evidence bearing upon that defense that was excluded by the trial justice would have been helpful in proving that affirmative defense, at the new trial it should not be excluded. Additionally, Fleet's expert witness, Edward McCrory (McCrory), who would have testified about how the plaintiffs' conduct substantially contributed to the unauthorized indorsement, should be permitted to testify. Also, the evidence pertaining to the refinancing of the Providence property through Marquette, which demonstrates Mollicone's control of the financial aspects of the Providence property project, is relevant to Fleet's defense and, if properly offered and presented, should be admitted.

## IV

### Conclusion

Because we conclude that a new trial is warranted as a result of the erroneous dismissal of Fleet's counterclaim, as well as by the failure by the trial justice to submit to the jury Fleet's affirmative defense permitted by § 6A–3–406, we need not address the other alleged errors raised by Fleet in its appeal or by the plaintiffs' in their cross-appeal. Our refusal to address those alleged errors that had been raised by the parties in this appeal is not intended, however, to imply that no such errors occurred. On remand, the trial justice should make such rulings as he or she deems appropriate given the circumstances as they arise at the new trial.

Accordingly, Fleet's appeal is sustained in part and denied in part. The plaintiffs' cross-appeal is denied pro forma. The judgment appealed from is vacated and the papers in this case are remanded to the Superior Court for a new trial in accordance with this opinion.

Chief Justice WEISBERGER was not able to be present at oral argument but participated on the basis of the briefs.

Justice FLANDERS did not participate.